J-S36002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF Z.N., A MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 825 WDA 2022 |

Appeal from the Order Entered June 15, 2022
In the Court of Common Pleas of Greene County
Orphans' Court at No:  No. 15 OA 2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF: L.R.N., A MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 826 WDA 2022 |

Appeal from the Order Entered June 15, 2022
In the Court of Common Pleas of Greene County
Orphans' Court at No:  14 O.A. 2021

| | | |
|---|---|---|
| IN RE: ADOPTION OF L.N., A MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.N., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 827 WDA 2022 |

Appeal from the Order Entered June 15, 2022
In the Court of Common Pleas of Greene County
Orphans' Court at No:  No. 13 OA 2021

BEFORE:   STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    **FILED: NOVEMBER 30, 2022**

Appellant, P.N. ("Father"), appeals from the orders entered on June 15, 2022, in the Court of Common Pleas of Greene County, involuntarily terminating his parental rights to his three children, Z.N., born in December of 2017, L.N., born in July of 2019, and L.R.N., born in July of 2020 (collectively, "the Children").[1]  After careful review, we affirm.

We begin with an overview of the factual and procedural history.  The family was first open for services with CYS in November 2019 due to the discovery of illicit substances in the home and the home's deplorable condition.  N.T., 3/8/22, at 12.  The orphans' court adjudicated Z.N. and L.N. dependent in 2019, and both children were taken into CYS custody.  *Id.* at 12-13.  At that time, CYS recommended services to address issues concerning drug and alcohol, housing, and parenting for the family.  *Id.* at 13-14.

In July of 2020, L.R.N. was born and remained with Mother on a safety plan.  *Id.* at 12, 16.  Father was not included in the safety plan because his

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Greene County Children and Youth Services ("CYS") filed petitions to confirm consent to adoption as to Children's mother, S.H. ("Mother").  There is no indication on the certified docket that the court terminated Mother's parental rights to the Children.  In addition, CYS filed petitions to involuntarily terminate any unknown father's parental rights.  There is no indication on the certified docket that the court terminated the parental rights of any unknown father.

whereabouts were unknown at that time. *Id.* at 16. In September of 2020, Z.N. and L.N. were returned to Mother. *Id.* at 14.

On October 5, 2020, CYS obtained custody of all the Children after receiving a report that Children and Mother were residing "with a sister who had no room and did not want them staying there." *Id.* at 14-15. CYS was also notified that Mother was incarcerated and tested positive for illicit substances in jail. *Id.* at 15. Additionally, L.R.N. had a severe diaper rash and a fungal infection all over her body, and her two siblings appeared "dirty." *Id.* CYS was informed that Father was "staying there a few days" but did not live at the residence. *Id.*

The following day, on October 6, 2020, Father was arrested but was released soon after on an unspecified date that same month. *Id.* at 24. Before the month ended, on October 27, 2020, Father was again incarcerated, and remained so until March 26, 2021. *Id.* at 18, 24. On March 29, 2021, Father presented to the CYS office and discussed the Children's Permanency Plan ("CPP") and services in which he was to participate. *Id.* at 18, 21, 24-25, 52. CYS offered Father nine visits with the Children at the agency between March 26 and June 6, 2021, but Father attended only two, on April 12 and April 19, 2021. *Id.* at 18, 25, 32, 53.

On June 6, 2021, Father was on pre-trial incarceration at Washington County Correctional Facility. *Id.* at 19, 28, 51, 54-55. According to Father, the Washington County trial court sentenced him to a "seven-year probation

program with a twenty-three-month restrictive treatment program." *Id.* at 49. Although it is unclear what Father's specific offenses are, Father testified that this matter was related to "veteran's court and drug court." *Id.* As part of his sentence, on January 7, 2022, Father was transferred from Washington County prison to Gaudenzia Crossroads Treatment facility ("Gaudenzia"), a drug and alcohol treatment center where he remained at the time of the termination proceeding. *Id.* at 29, 48-49. While at Gaudenzia, Father was offered biweekly virtual visits with the Children. *Id.* at 40-42. Father attended one virtual visit that lasted twenty minutes in February of 2022. *Id.* at 40-41.

On June 21, 2021, CYS filed petitions to involuntarily terminate Father's parental rights to the Children. With respect to Z.N. and L.N., CYS alleged grounds for termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). With respect to L.R.N., CYS alleged grounds under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).[2]

The orphans' court held a hearing on the petitions on March 8, 2022.[3] CYS presented testimony from Jennifer Van Kirk, the CYS caseworker, and

---

[2] On December 21, 2021, CYS filed an amended petition for involuntary termination of Father's parental rights to L.R.N. to include the additional basis of 23 Pa.C.S.A. § 2511(a)(8).

[3] By this date, the Children, Z.N, L.N., and L.R.N., were four years old, two years old, and one year old, respectively. The Children's best interests were represented during the hearing by a guardian *ad litem* ("GAL"), and each
*(Footnote Continued Next Page)*

M.P., the foster mother to Z.N. and L.N.  Father testified on his own behalf *via* videoconference from Gaudenzia.

At the conclusion of the hearing, the orphans' court directed counsel for CYS and counsel for Father to file Findings of Fact and Conclusions of Law within fifteen days of their receipt of the transcript.  CYS and Father filed proposed findings of fact and conclusions of law on April 25, 2022, and April 14, 2022, respectively.  By memoranda and orders dated and entered on June 15, 2022, the orphans' court involuntarily terminated Father's parental rights to the Children.[4, 5]

On July 14, 2022, Father timely filed notices of appeal and concise statements of matters complained of on appeal pursuant to Pa.R.A.P.

---

child's legal interests were represented by separate counsel.  Legal counsel for Z.N. participated *via* videoconference.

[4] The orphans' court issued a separate memorandum and order for each child, Z.N., L.N., and L.R.N.  The court's reasoning and conclusions of law in each of the orders are substantially similar.  In turn, we will refer only to the orphans' court's memorandum and order issued with respect to Z.N., and we cite it as "Orphans' Court Opinion."

[5] In its opinion, the orphans' court did not identify the particular subsection of Section 2511(a) under which it terminated Father's parental rights.  However, CYS filed petitions seeking involuntary termination of Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8).  The court acknowledged that CYS alleged grounds for termination of Father's parental rights consistent with the provisions of 23 Pa.[C.S.A.] [§] 2511(a).  Orphans' Court Opinion at 1 (unpaginated).  Because this Court need only agree with any one subsection of Section 2511(a) in order to affirm the termination of parental rights, we review the order under Section 2511(a)(2) only.  **See In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed separate statements pursuant to Rule 1925(a), wherein it relied upon its reasoning set forth in the subject memoranda and orders.

Father raises the following issues for review in his appeals relating to the Children.

1. Whether the [orphans'] court erred in finding that [CYS] had proven by clear and convincing evidence that it had established the statutory grounds for termination under 23 [Pa.C.S.A. § 2511(a)](1), (2), (5), and (8).

2. Whether the [orphans'] court erred in finding that the [Father] failed to make sufficient progress toward successful parenting and complying with services due to obstacles that were mostly "self-inflicted[.]"

3. Whether the [orphans'] court erred in not giving appropriate weight to the effect of the COVID-19 pandemic on the [Father's] ability to engage in the services necessary to reunify with his [C]hildren.

Father's Brief at 7.

In reviewing Father's appeal from the orders terminating his parental rights, we bear in mind the following standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where

the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." **C.M.**, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." **Id.**; **see also** 23 Pa.C.S.A. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under Section 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." **Interest of L.W.**, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. **In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

Here, we review the orphans' court's order pursuant to Section 2511(a)(2) and (b), which provide as follows:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (internal citation omitted)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (quoting *In re*

*N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011)). As such, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, 247 A.3d at 1105 (quoting *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010)).

Our Supreme Court in *S.P.* addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied." *S.P.*, 47 A.3d at 828. Further, the Court explained,

> [I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2).

*Id.* at 830.

Instantly, the orphans' court, in terminating Father's parental rights under Section 2511(a), found that:

> There were also many obstacles to [Father] parenting successfully and complying with services. Most, if not all, of these obstacles were self-inflicted.

- 10 -

Orphans' Court Opinion at 8. The record reveals the "obstacles" to Father's ability to successfully parent were primarily due to Father's repeated incarceration throughout the Children's dependency matters. **See** N.T., 3/8/21, at 17-20, 24, 51. The court acknowledged that "incarceration alone cannot be used as a reason to terminate." Orphans' Court Opinion at 8. The court further found that:

> While [Father] may have been incarcerated during certain periods of time, he really did very little to pursue the parent-child relationship[ ] or perform parental duties, whether incarcerated or not.

***Id.***

In his brief, Father combines all three issues into a single argument.[6] **See** Father's Brief at 12-23. Father argues the orphans' court erred in finding that CYS met its burden of establishing the grounds for termination of his parental rights under Section 2511(a) by clear and convincing evidence. ***Id.*** at 16. Father contends that the court erred in characterizing the obstacles to his ability to parent as "self-inflicted." ***Id.*** at 20, 22. He asserts that he was

_____

[6] In so doing, Father fails to comply with Rule 2119(a), which provides:

> The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein, followed by such discussion and citation of the authorities as are deemed pertinent.

Pa.R.A.P. 2119(a). As Father addresses all three issues in one argument, our analysis does the same.

unable to obtain the necessary services while he was incarcerated from June 6, 2021 through January 7, 2022, due to factors "out of his control," including the COVID-19 pandemic and CYS's failure to arrange services for him. *Id.* at 20-21. Father's argument is unpersuasive.

Father concedes that he has been incarcerated "throughout much of the life of this case." Father's Brief at 17. The record shows that Father was incarcerated on October 6, 2020, at which time he tested positive for amphetamines. N.T., 3/8/22, at 20. Though released later that same month, Father was incarcerated again on October 27, 2020, and remained in prison until March 26, 2021. *Id.* at 17-18. Subsequently, he was incarcerated a third time from June 6, 2021, until January 7, 2022. *Id.* at 19, 51. Father acknowledges that his incarceration on June 6, 2021, "may well have been 'self-inflicted.'" Father's Brief at 19. On direct-examination, Father was asked about the reason for his June 2021 imprisonment, and he testified that he "caught a new case" and "got incarcerated." N.T., 3/8/22, at 54.

By the March 2022 hearing, the Children had been in CYS custody continuously for approximately seventeen months. *See id.* at 14. During that period, Father was incarcerated for nearly twelve months, and he was at Gaudenzia for two months. *See id.* at 17-19, 48, 51. In turn, Father's repeated and continued incapacity due to his incarceration caused the Children to be without Father's essential parental care, control, or subsistence necessary for their well-being. *See generally In re A.S.*, 11 A.3d 473, 480-

481 (Pa. Super. 2010) (finding parent's recurrent incarceration to be evidence of parental incapacity and that his pattern of behavior supported trial court's conclusion that the parent refused to remedy the conditions that led to children's placement); *S.P.*, 47 A.3d at 831 (finding trial court did not err in concluding that Section 2511(a)(2) was met where father was incarcerated before the child's birth and never provided child with essential parental care).

Father claims "he was unable to access services from June 6, 2021, through January 7, 2022 through no fault of his own." Father's Brief at 21. He asserts that he "should not be penalized" due to CYS failing to arrange services for him and the COVID-19 pandemic limiting his access to services while in prison. *Id.* We reject Father's claims.

It is important to note that Father did not engage in the services offered to him even before his June 2021 incarceration. Father testified he was aware of CYS's involvement with his family and the services requested of him since 2019. N.T., 3/8/22, at 62-63. Father testified that in September 2020, he was "completely uncooperative," "using drugs," and did not have a phone at the time. *Id.* at 63. Moreover, immediately prior to his June 2021 incarceration, Father had been out of prison for approximately ten weeks, but he did not engage in services, aside from visitation, during that period. *See id.* at 17-19, 21, 53-54. Ms. Van Kirk, the CYS caseworker, testified that she spoke to Father about his objectives and referred Father for a drug and alcohol assessment, an anger management program at Catholic Charities, Greene

County Safe Parenting program, and visitation with the Children. *Id.* at 18, 21, 31. Ms. Van Kirk, however, testified that she was not aware of Father making any progress in those services, aside from visiting the Children two times. *Id.* at 18, 21. Father also testified that visitation was the only service he complied with before returning to prison in June 2021. *Id.* at 54. Father did not offer any explanation for participating in only visitations and failing to engage in any of the other services while he was released.

Although Father testified that he complied with visitation prior to his June 2021 incarceration, he attended only two of the nine visits offered by CYS between March 26 and June 6, 2021. *Id.* at 18, 25, 53-54. When asked why he did not attend the remaining seven visits, Father testified he lacked transportation and a working cell phone. *Id.* at 53. He also testified that he "moved to Washington [county]" and "it was just hard" to schedule the visits. *Id.* Father further explained:

> So, I wasn't able to (*inaudible*), and then I got incarcerated subsequently after. But just the pandemic (*inaudible*), just living -- living (*inaudible*) communication, (*inaudible*) homeless (*inaudible*) communication, (*inaudible*) communication.

*Id.* at 53.

Notably, Ms. Van Kirk testified that Father was offered a total of thirty-seven visits in this case, and he never visited the Children before March 2021. *Id.* at 25-26. Ms. Van Kirk also testified that she requested Father to submit a drug screen before each of the two visits at the agency in April 2021. *Id.* at 18, 20, 32. Ms. Van Kirk testified that on April 12, 2021, Father declined

to provide a screen because "he said he knew he would test positive." *Id.* at 20. On April 19, 2021, Father tested positive for marijuana. *Id.*

Father claims that he used the means available to him to maintain contact with the Children while incarcerated by writing letters and receiving pictures of the Children. Father's Brief at 21. M.P., foster mother to Z.N. and L.N., testified that she received one letter from Father, and the CYS caseworker brought coloring pictures from Father on a separate occasion. N.T., 3/8/22, at 44. M.P. testified she sent Father correspondence with a picture of Z.N. and L.N. *Id.* M.P. testified that Father attended only one virtual visit with the Children in February of 2022, and Father ended the visit after twenty minutes. *Id.* at 40-42. M.P. also noted that the foster parents joined a subsequent virtual visit and waited approximately twenty minutes, but Father never joined that visit. *Id.* at 42. Father's lack of consistent contact with the Children is further evidence of his neglect or refusal, causing the Children to be without the essential parental care, control, or subsistence necessary for their physical or mental well-being.

At the time of the hearing, Father was at Gaudenzia, and he testified that he planned to leave Gaudenzia two weeks after the hearing, and enter a halfway house, called Another Way, for ninety days. N.T., 3/8/22, at 48-49, 64. According to Father, he was sentenced to a "seven-year probation program with a twenty-three-month restrictive treatment program." *Id.* at 49, 51. On cross-examination, Father was asked if he had any place for the

Children to go right now if they were returned to him that day. *Id.* at 64.

Father identified his sister and his mother as individuals who are willing to take the Children. *Id*. at 64-65. Father, notably, did not identify himself as being able, ready, or willing to care for the Children on the day of the hearing. Despite Father's stated intention to complete his drug and alcohol treatment and enter a halfway home, Father's assertion is speculative, and his future compliance is uncertain. *See In re S.C.*, 247 A.3d at 1105 ("A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.") (citation omitted). Moreover, Father has not indicated how or whether he will address the remaining services of parenting and anger management. *See generally In re S.P.*, 47 A.3d at 831 (upholding trial court's termination of a father's parental rights where record revealed father's parole date was uncertain, and that, "even upon parole, father would reside in a half-way house and would need to obtain housing, employment, and transportation in addition to parenting skills").

Ultimately, the orphans' court properly found that Father "has shown a repeated and continuing incapacity and neglect." Orphans' Court Opinion at 8. The court correctly noted that Father "really did very little to pursue the parent-child relationship" or "perform parental duties, whether incarcerated or not." *Id.* The court also noted that Father "did little to establish himself in a manner that he could have physical custody of the [Children] and perform

parental duties as would be expected." *Id.* The record shows that Father's repeated incapacity, neglect, and refusal, as evidenced by his recurrent incarceration due to his own conduct, minimal visitation with the Children, and failure to engage in the other services recommended by CYS, caused the Children to be without essential parental, care, control or subsistence necessary for their well-being. Further, the cause of Father's incapacity, neglect or refusal cannot or will not be remedied. *See* 23 Pa.C.S.A. § 2511(a)(2).

To the extent that Father argues there was a lack of reasonable efforts on the part of CYS to reunify him with the Children, Father's argument is without merit because our Supreme Court has held that neither Section 2511(a) nor (b) "requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights." *In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014). Although the Court recognized "the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child[,]" it held that the provision of reasonable efforts to reunite parents and children is not a requirement for termination. *Id.*

Even if reasonable efforts were relevant, the record amply demonstrates that CYS did provide them. Ms. Van Kirk testified that, during Father's imprisonment between October 27, 2020, and March 26, 2021, she "would take things to the jail to get signatures, so [Father] was aware of court dates

and CPPs." N.T., 3/8/22, at 18. During his ten-week release from prison in 2021, Ms. Van Kirk met with Father and discussed his CPP objectives and made the appropriate referrals for services. *Id.* at 18, 21, 30-31. When Father returned to prison in June 2021, Ms. Van Kirk testified that she initially was unaware that Father was incarcerated again and that she could not get in touch with him. *Id.* at 27, 30. When asked how CYS became aware of Father's return to prison, Ms. Van Kirk testified, "I think it was -- for the next court date, we were trying to serve him." *Id.* at 27. Ms. Van Kirk, however, could not recall the specific date. *Id.* When asked if she visited Father at Washington County prison, Ms. Van Kirk testified that she "would take forms up to sign, and they would take them from me and take them back to him." *Id.* However, Ms. Van Kirk did not see Father on those occasions due to the prison's visitation rules. *Id.* at 27-28. Ms. Van Kirk testified her first contact with Father after his June 2021 incarceration was when Father called her from Gaudenzia on February 2, 2022. *Id.* at 19-20, 28.

Thus, we conclude the record supports the orphans' court's determination to involuntarily terminate Father's parental rights to the Children under Section 2511(a)(2). We discern no abuse of discretion or error of law with the orphans' court's decision.

We do not address Section 2511(b) because Father failed to include any such claim in his concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(b)(4). In addition, Father failed to include any challenge

- 18 -

regarding Section 2511(b) in the statement of questions involved portion of his brief. **See In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2017) ("[I]t is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived."). Thus, Father has waived any claim relating to Section 2511(b).

Accordingly, we affirm the orders terminating Father's parental rights pursuant to Section 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/30/2022